**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| NOBOTS LLC, | Case No. 6:21-cv-1290 |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| GOOGLE, LLC, | |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

This is an action for patent infringement in which Nobots LLC ("Nobots") makes the following allegations against Google, LLC ("Google"), who without authority makes, distributes, offers for sale, and/or sells in the United States products and/or operating system software for products that infringe the Asserted Patents.

**PARTIES**

1.      Plaintiff Nobots LLC is a limited liability company organized and existing under the laws of the State of Washington with a place of business at 13946 147th Place SE, Renton, Washington 98059. Nobots is the owner of all rights, title, and interest in and to United States Patent No. 9,595,008 (the "'008 Patent") and United States Patent No. 10,423,885 (the "'885 Patent") (together, the "Asserted Patents").

2.      Defendant Google, LLC is a limited liability company organized under the laws of Delaware. Google maintains regular and established places of business throughout this District, including at 100 Congress Avenue, Austin, Texas, 78701; 901 E. Fifth Street, Austin, Texas, 78701; 500 West Second Street, Austin, Texas, 78701; 601 West Second Street, Austin, Texas, 78701; and 110 East Houston Street, San Antonio, Texas, 78205. Google may be served with

1

process through its registered agent, the Corporation Service Company, at 211 East 7th Street, Suite 620, Austin, Texas, 78701. Google is registered to do business in the State of Texas and has been since at least November 17, 2006.

3.      Google also owns personal property throughout this District, including at 807 Ruby Drive, Austin, Texas, 78753; 10200 MC Kalla Place, Austin, Texas, 78758; 500 Chicon Street B, Austin, Texas, 78702; 500 West Second Street, Austin, Texas, 78701; 201 Colorado Street, Austin, Texas, 78701; 4100 Smith School Road, Austin, Texas, 78744; 701 E Parmer Lane, Austin, Texas, 78753; 845 Interchange Boulevard, Austin, Texas, 78721; 500 West Second Street 1450, Austin, Texas, 78701; 9606 N. Mo-Pac Expressway 700, Austin, Texas, 78759; 304 E. 24th Street, Austin, Texas, 78705; 100 East Houston Street, San Antonio, Texas, 78205; 8862 Garnett, San Antonio, Texas, 74221; 5903 Distribution, San Antonio, Texas, 78218; 819 S Laredo, San Antonio, Texas, 78204; 2350 South Midkiff Road, Midland, Texas, 79701; 500 West Overland Avenue, El Paso, Texas, 79901; 501 West Overland Avenue, El Paso, Texas, 79901; 4140 Rio Bravo Street, El Paso, Texas, 79902.

4.      Google does business in this District and across the State of Texas. It has over 1,700 full-time employees in Texas. On information and belief, the majority of those employees are located in this District. Google proudly touts that it provided $26.45 billion of economic activity for 162,400 Texas businesses, nonprofits, publishers, creators, and developers in 2020, and that 1.43 million Texas businesses connect directly with their customers using Google products, including those that infringe and unlawfully profit off the inventions claimed in the Asserted Patents. This year, Google announced its plans to invest $50 million in Texas in 2021 in office space and data centers alone. Google also proudly touts that it has awarded over $10 million in grants to nonprofits and organizations based in Texas, has donated over $10 million in charitable

giving to Texas nonprofits, and has invested more than $1 billion in renewable energy in Texas. For these and other reasons, and to generate additional business in and tax incentives from the State of Texas, Google proudly calls this District, "Our home in the Lone Star State," for which "Google is proud to have roots in Texas, with our Austin office housing teams focused on Android, Google Cloud, finance, and more," including designing, implementing, and monetizing those methods and products that infringe the Asserted Patents.[1]

5.      In addition to its offices and employees in this District, Google also has places of business and employees and agents conducting its business throughout the State of Texas, including through methods and practices that unlawfully infringe and make money off the inventions claimed in the Asserted Patents, such as at its office in Dallas, its data center in Midlothian, and its brand-new office in Houston (built in 2021).

6.      On information and belief, Google's in-house legal department also has a substantial presence in Austin, Texas. Google's Careers website includes job postings for both "Litigation Counsel, Patent Litigation" and "Litigation Paralegal" roles with the option to work in Austin.[2] Given the location of Google legal personnel in Austin, on information and belief, documents, materials, and potential witnesses relevant to this action are located in this District.

7.      Google has placed or contributed to placing infringing products, such as Google reCAPTCHA, into the stream of commerce via established distribution channels knowing or understanding that such products would be sold and used in the United States, including in this District. Google also has derived substantial revenue from infringing acts in this District, including

---

[1] *See, e.g.*, Economic Impact Report Texas, *Google Helps Texas Businesses Move Toward Their Goals* (accessed Nov. 11, 2021), available at: https://economicimpact.google.com/state/tx/
[2] *See, e.g.*, Google Careers, *Litigation Counsel, Patent Litigation* (accessed Oct. 3, 2021), available at: https://careers.google.com/jobs/results/129929351756948166-litigation-counsel-patent-litigation/?category=LEGAL&company=Google&company=YouTube&hl=en&jlo=en-US&location=Austin,%20TX,%20USA.

from development, distribution, and sale of the infringing methods, such as reCAPTCHA.

8.      On information and belief, Google designs, manufactures, distributes, imports, offers for sale, and/or sells in the State of Texas and this District products and/or operating system software for products that infringe the Asserted Patents.

## JURISDICTION AND VENUE

9.      This is an action for patent infringement arising under the patent laws of the United States. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.     This Court has personal jurisdiction over Google because it conducts business in and has committed acts of patent infringement in this District and throughout the State of Texas, and has established minimum contacts with this forum state such that the exercise of jurisdiction over Google would not offend the traditional notions of fair play and substantial justice.

11.     Upon information and belief, Google transacts substantial business with entities and individuals in the State of Texas and this District by, among other things, designing, using, offering to sell, distributing, and selling products and/or operating system software for products that infringe the Asserted Patents, including the infringing reCAPTCHA methods that Google purposefully uses, sells, offers for sale, and directs into the State of Texas and this District as alleged herein, as well as by providing service and support to reCAPTCHA customers in this District,[3] and/or inducing others to commit acts of patent infringement in this District.

12.     Google places the accused methods into the stream of commerce via authorized and established distribution channels with the knowledge and expectation that they will be used and sold in the State of Texas and this District, and does not otherwise permit the use, distribution, or

---

[3] *See,     e.g.,     Honor     Code     Reporting     Form*,     Baylor     Univ., https://cm.maxient.com/reportingform.php?BaylorUniv&layout_id=5 (last visited Nov. 5, 2021) (reflecting that the page is protected by reCAPTCHA v2 Invisible, one of the infringing methods of reCAPTCHA).

sale of the accused methods outside of these authorized and established distribution channels.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because Google has committed acts of infringement in this District and has regular and established places of business in this District, including at 100 Congress Avenue, Austin, Texas, 78701; 901 E. Fifth Street, Austin, Texas, 78701; 500 West Second Street, Austin, Texas, 78701; 601 West Second Street, Austin, Texas, 78701; and 110 East Houston Street, San Antonio, Texas 78205. *See In re Cray Inc.*, 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

14.     Furthermore, Google designs, uses, distributes, sells, and/or offers for sale the accused reCAPTCHA methods to consumers, businesses, education facilities, and government organizations located in this District, such as Baylor University, Board & Brush, Billy Bob's Burgers, LeafFilter, and Roots Waco, all located in Waco, Texas. For example, Baylor University's website reflects that it is protected by reCAPTCHA v2 Invisible,[4] an accused method of reCAPTCHA discussed in further detail in paragraph 41, *infra*. When consumers in this District, and across the State of Texas, access the websites and apps of such businesses in this District, Google subjects these businesses and consumers in this District to Google's privacy policies and uses Google's infringing reCAPTCHA methods and products to collect personal information and data from the consumers in this District for Google's own use and profit.

15.     Upon information and belief, a substantial number of Google employees based in or who regularly conduct Google business from this District have knowledge, information, documents, and things relevant to this action and are potential witnesses to this action, including as to Google's infringing activities and Nobots's damages. For instance, Bhanchand Prasad, a

---

[4] *See id*.

reCAPTCHA Security Customer Engineer at Google Cloud, is located in Austin, Texas.[5] As another example, Marty Sedlacek, Head of Solutions Sales at Google Cloud, who is responsible for corporate strategy in support of all Google Cloud technologies, including Google reCAPTCHA, also is located in Austin, Texas.[6] As another example, Zach Jordan, Head of Sales, Digital Enterprise, at Google Cloud, who oversees Google Cloud sales to enterprise clients, also is located in Austin, Texas.[7] As another example, Jen Person, Senior Development Advocate for Google Cloud, who is responsible for driving customer success and educating developers about Google Cloud, including reCAPTCHA, also is located in Austin, Texas.[8]

**THE ASSERTED PATENTS**

16.     This Complaint asserts causes of action for infringement of United States Patent No. 9,595,008 and United States Patent No. 10,423,885. The Asserted Patents are valid and enforceable United States Patents, the entire right, title, and interest to which Nobots owns by assignment.

17.     The Asserted Patents improve upon and teach novel "CAPTCHA" (Completely Automated Public Turing test to tell Computers and Humans Apart) methods for assessing a confidence level that an operator of a computing device interacting with a server is a human being

---

[5] *See Bhanchand Prasad*, LinkedIn, https://www.linkedin.com/in/bhanchand-prasad (last visited Nov. 13, 2021).

[6] *See Marty Sedlacek*, LinkedIn, https://www.linkedin.com/in/marty-sedlacek-0b4393/ (last visited Nov. 13, 2021); *see also, e.g.*, Sedlacek, Marty [@martyjsedlacek], "See how Caribou Coffee uses reCAPTCHA Enterprise to create safe and frictionless digital experiences @googlecloud." *Twitter*, Sept. 2, 2021, https://twitter.com/search?lang=en&q=(recaptcha%20OR%20security%20OR%20bot)%20(from%3Amartyjsedlacek)&src=typed_query (last visited Nov. 13, 2021)

[7] *See Zach Jordan*, LinkedIn, https://www.linkedin.com/in/zachjordan1/ (last visited Nov. 13, 2021).

[8]          *See        Jen        Person*,        Developer        Advocates, https://cloud.google.com/developers/advocates/jen-person (last visited Nov. 13, 2021); *see also, e.g.*, Jen Person, *reCAPTCHA Enterprise, Network Connectivity Center, & More*, YouTube (Nov. 8, 2021), available at https://www.youtube.com/watch?v=pJNSsyojkys (last visited Nov. 13, 2021).

rather than an autonomic computer application employing various algorithms and routines (a "bot") and protecting websites and applications from fraudulent activity, spam, and abuse without creating friction for human users.

18.     On March 14, 2017, the U.S. Patent and Trademark Office duly and legally issued the '008 Patent, which is entitled "Systems, Methods, Apparatus for Evaluating Status of Computing Device User." A true and correct copy of the '008 Patent is attached as **Exhibit A**.

19.     The '008 Patent generally claims methods for assessing a confidence level that an operator of a client computing device interacting with a server is a human rather than a bot, by presenting issued data from the server to the client computing device and monitoring and comparing at least some of the data generated at the client computing device in response to the issued data.

20.     To the extent applicable, Nobots has complied with 35 U.S.C. § 287(a) with respect to the '008 Patent.

21.     On September 24, 2019, the U.S. Patent and Trademark Office duly and legally issued the '885 Patent, which is entitled "Systems, Methods and Apparatus for Evaluating Status of Computing Device User." A true and correct copy of the '885 Patent is attached as **Exhibit B**.

22.     The '885 Patent generally claims methods for testing for the presence of biometric data associated with an operator of a computing device attempting to access a server and controlling access to the server by denying access to the computing device when the biometric data is not present and/or not denying access of the computing device when some biometric data is present.

23.     To the extent applicable, Nobots has complied with 35 U.S.C. § 287(a) with respect to the '885 Patent.

24.     Nobots owns all rights, title, and interest in and to the Asserted Patents, including the sole right to sue for any infringement, and possesses all rights of recovery.

## FACTUAL ALLEGATIONS

25.     Fraudulent web activities cost enterprises billions of dollars each year. Security teams need to keep bots out of their websites and applications while ensuring that their human customers can always get in. In an effort to block these bots, builders of websites and apps have created a variety of security methods to determine if the user is a bot or a human. The object is to create a test that a bot cannot easily parse but that is passable by a human.

26.     Carnegie Mellon University coined the term "CAPTCHA" (Completely Automated Public Turing test to tell Computers and Humans Apart) for these types of tests. Initial efforts required a user to simply enter an alphanumeric string into an input field. However, as character-recognition engines became more available, such tests became easily defeated.

27.     In 2007, Timothy P. Heikell invented CAPTCHA security methods that use information such as, without limitation, biometric data, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third-party data regarding abusers, etc., and a confidence score analysis to prevent fraud and keep bots out of websites and apps while allowing desired users to gain access to offered content, through methods which can easily be implemented, automatically, without requiring additional user input and thus without bothering, frustrating, or stopping safe or desired users.

28.     These novel and now-popular methods claimed in the Asserted Patents significantly improve upon prior CAPTCHA security methods, satisfy long-felt needs of enterprises and consumers alike, and are now wildly commercially successful for Google, who reportedly employs them hundreds of millions of times every day.

29.     For many years after 2007, however, the most popular websites in the world, including Google, Yahoo, YouTube, Microsoft's Live ID, MySpace, Facebook, Wikipedia, and Craigslist, continued to use prior art CAPTCHA security methods. Initial efforts required a user to simply enter an alphanumeric string into an input field, requiring the user to type the letters, digits, or characters of a distorted image appearing on the screen. These prior art methods provided rudimentary security, were dependent on user input and proficiency, and could not be implemented in all settings or for all users. For example, users with certain disabilities, such as those who are visually impaired or have dyslexia, and users who are not native English speakers may have trouble with parsing through the distorted text employed by prior art CAPTCHA methods.

30.     In 2009, Google acquired reCAPTCHA, a company that had provided CAPTCHAs to help protect more than 100,000 websites from spam and fraud.[9] Google reportedly acquired the reCAPTCHA technology for between $10 million and $100 million.[10]

31.     For many years thereafter, the reCAPTCHA utility that Google used involved a challenge-response test to determine whether or not a user was a human. As depicted in Figure 1, one test presented distorted text that a user needed to enter to prove the user was human.

**Figure 1**



---

[9] *Teaching Computers to Read: Google Acquires reCAPTCHA*, Google Blog (Sept. 16, 2009), available at https://googleblog.blogspot.com/2009/09/teaching-computers-to-read-google.html (last accessed on Nov. 13, 2021).

[10] Alison Griswold, *How Luis Von Ahn Turned countless Hours of Mindless Activity Into Something Valuable*, Business Insider (Mar. 13, 2014), available at https://www.businessinsider.com/luis-von-ahn-creator-of-duolingo-recaptcha-2014-3 (last accessed on Nov. 13, 2021).

32.     Such tests were successful for a period of time in preventing non-adaptive software from recognizing the imaged characters, but people intent on abusing websites soon designed ways to circumvent the CAPTCHA, such as through specially tuned character recognition programs. As bots and fraudsters became more sophisticated, the desire to defeat the bots and prevent fraud resulted in images that were so distorted that some human users could not decipher the images.

33.     Another attempt at a solution, also depicted in Figure 1 above, was to add a link to a sound file that would speak the distorted characters to the user, but this attempt at a solution also failed when these sound files also needed to be drastically distorted to protect against being discerned by increasingly sophisticated bots employing speech pattern matching algorithms. This attempt at a solution also could not easily be implemented for all users or in all settings because, for example, not all users have functioning audio equipment and environments such as libraries, government utilities, and work settings may not permit or enable such auditory methods.

34.     Despite their widespread use, these prior art security methods proved ineffective and frustrating. Because computer artificial intelligence quickly improved in responding to the type of challenge-response test depicted in Figure 1, such techniques became ineffective at eliminating bots. And the desire to defeat these increasingly intelligent bots also resulted in images that were so distorted that human users, especially those with visual or hearing deficiency or imparity, became unable to pass the tests. The end result was that the prior art CAPTCHA methods were neither keeping out bots and preventing fraud, nor permitting human users to get in and access the desired content, at least not without blocking or frustrating significant human users.

35.     What was needed was a more robust form of security—one that was neither easily defeated by bots, nor would keep out or frustrate human users trying to access the enterprises' websites and applications. As claimed in the Asserted Patents, Mr. Heikell solved this long-felt

need by inventing, way back in 2007, new and improved CAPTCHA security methods, which shifted the burden of proof for assessing the likely user status of a computing device from the user side to the server side of the equation, by analyzing biometric and other available data of the user in response to data issued by the server and yielding a probability value, or confidence score, that the user is a human being rather than a bot.

36.     For example, in exemplary embodiments, this assessment method comprises comparing acquired or available data relating to the operation of the computing device to suitable models embodying human user derived data, or model data, indicative of human interaction with a computing device. Operating in the background, and without the need for the user to decipher or pass any challenge-response tests, the methods monitor at least some data generated by the user trying to access the website or application (e.g., mouse movements, key stroke combinations, browser cookies, IP addresses), compare the data generated by the user to model data indicative of a human interaction, and generate a value that represents a confidence level that the monitored data is a result of human interaction on the client computing device rather than that of a bot.

37.     Nobots's inventions are incredibly valuable and significantly improved upon the prior art CAPTCHA security methods. Focusing on biometric and/or passive data (such as, e.g., browser cookies or IP information) passed from the computing device, rather than on answers to prior art challenge-response tests, achieves the objective of keeping bots out and permitting access by human users, while enhancing and without frustrating the human user experience on the website or app. Because a given dataset for each human person is unique, and not easily replicated by bots, security is enhanced without increasing the likelihood that desired human users will "fail" the assessment as was common with the prior art challenge-response methods. The user experience also is enhanced because the assessment can occur and a confidence level can be generated without

requiring any incremental inputs from the user. For example, both biometric data and passive user data can be monitored and compared in the background without prompting the user for such data.

38.     By yielding a probability value or confidence level that an operator of a client computing device is a human user rather than a bot, instead of the prior art method of yielding a binary conclusion of bot or not, exemplary embodiments of the CAPTCHA security methods claimed in the Asserted Patents also enable a program or administrator on the website or application to permit or deny access and/or operation to the computing device along a sliding scale, rather than binary "in" or "out." In such an exemplary embodiment, if no biometric activity is recorded, there is a very high probability that the user is actually a bot; if substantial and robust biometric activity is recorded, there is a very high probability that the user is actually a human; and when the claimed methods yield a confidence level between these two probability levels, the administrator of the server is empowered to choose which confidence values, in which circumstances, must be generated in order for the operator of the client computing device to be permitted access to the subject website or app. By avoiding the "there is only one right answer" phenomenon inherent in the prior art, such embodiments also simultaneously enhance security without unnecessarily impairing the user experience because the old mode one-sized-fits-all methods are replaced by a more dynamic security regime in which each website (e.g., social media websites versus bank websites) and even pages within websites (e.g., home pages versus credit card checkout pages) can define (and change) the confidence value which must be generated to permit access to their site.

39.     The methods taught by the Asserted Patents also are easily implemented, automatically, without incremental user input, for all human users, in all settings, for use in websites and apps alike. The recited comparisons can take place locally on the computing device,

remotely on the originating server, or on a server dedicated to performing such actions. Because the exemplary embodiments can be accomplished exclusively from the server side, it is not necessary to distribute or install in the conventional sense client-side software, and existing available browsers and operating systems provide the means necessary to carry out the invented methods. For example, neither biometric nor passive user data is affected by visual or hearing deficiency or imparity, or even just by a lack of human user literacy or proficiency. Auditory and visual challenges can be eliminated entirely.

40.     In December 2014, more than seven years after Mr. Heikell invented these revolutionary CAPTCHA security methods and filed for patent protection in the Asserted Patents, Google implemented and began using, distributing, offering for sale, and selling reCAPTCHA v2, which practiced Mr. Heikell's inventions. Eliminating the need for a user to read and decipher distorted text, as required by reCAPTCHA and demonstrated in Figure 1 above, reCAPTCHA v2 instead required users to select a checkbox next to the words "I am not a robot," as depicted in Figure 2 below. When the checkbox was selected, a web request was made to Google, which then evaluated the likelihood that the user was a human or a bot based on a comparison of model data and the computing device's passive data and/or interactions with the web page. In certain cases, as depicted in Figure 3 below, Google's reCAPTCHA v2 required users to complete an additional or different test, in which the user was asked to, for example, select from a group of images a subset of those images with certain characteristics. This method of reCAPTCHA also includes the use of event listeners to monitor for biometric data. Although each of these methods started to rely on comparisons of monitored data and model data, as taught by the Asserted Patents, Google reCAPTCHA v2 remained dependent on the prior art challenge-response, user-focused security regime.

**Figure 2**



**Figure 3**



41.    On March 14, 2017, the United States Patent and Trademark Office issued the '008

Patent, entitled "Systems, Methods, Apparatus for Evaluating Status of Computing Device User."

That same month, Google launched reCAPTCHA v2 Invisible or "Invisible reCAPTCHA." In

Google's words, "To stay one step ahead of the bad guys, reCAPTCHA needed to keep evolving

to ensure the most delightful user experience. And now we're taking it even further. Can you see

it? Of course not. It's invisible. Powering these advances is a combination of machine learning and

advanced risk analysis that adapt to new and emerging threats. So whether on desktop or mobile,

reCAPTCHA still means no frustration. People get to where they're going faster and everyone

stays happy, except bots."[11] The infringing methods employed by Google's Invisible reCAPTCHA were immediately and contemporaneously praised as "new" and "better" technology, allegedly developed by Google—and not by Mr. Heikell nearly a decade earlier, as actually was the case.[12]

42.    On January 11, 2018, the United States Patent and Trademark Office published Patent Application US 2018/0012138 A1, which would later issue as the '885 Patent.

43.    On October 29, 2018—more than eleven years after Mr. Heikell made his patented inventions, nineteen months after the '008 Patent issued, and ten months after the '885 Patent application was published—Google launched reCAPTCHA v3, which Google again heralded as "the new way to stop bots" because it works "without user interaction" and "returns a score so you can choose the most appropriate action for your website,"[13] even though these methods had been invented by Mr. Heikell way back in 2007. As Google put it at the time, "Now with reCAPTCHA v3, we are fundamentally changing how sites can test for human vs. bot activities by returning a score to tell you how suspicious an interaction is and eliminating the need to interrupt users with challenges at all. reCAPTCHA v3 runs adaptive risk analysis in the background to alert you of

---

[11] *See* Google Search Central, *reCAPTCHA: Tough on Bots, Easy on Humans*, YouTube (May 19, 2016), available at https://www.youtube.com/watch?v=GeibaHfYW9o&t=18s (last accessed on Nov. 14, 2021).

[12] *See, e.g.*, Ayesha Ahmad, *No More Blurry Images to Prove You're a Human – Google Introduced Invisible reCAPTCHA*, MustTech News (Mar. 21, 2017), available at https://www.musttechnews.com/google-introduces-invisible-recaptcha/ (last accessed Nov. 14, 2021); Shona Ghosh, *Google Has Killed Off reCAPTCHA As You Know It*, Business Insider (Mar. 13, 2017), available at https://www.businessinsider.com/googles-recaptcha-is-now-invisible-2017-3 (last accessed Nov. 14, 2021); Rob Verger, *Google Just Made the Internet A Tiny Bit Less Annoying*: *See ya, CAPTCHA!*, Popular Science (Mar. 11, 2017), available at https://www.popsci.com/google-invisible-recaptcha/#page-3 (last accessed Nov. 14, 2021); Ron Amadeo, *Google's reCAPTCHA Turns 'Invisible,' Will Separate Bots From People Without Challenges*, Ars Technica (Mar. 9, 2017), available at https://arstechnica.com/gadgets/2017/03/googles-recaptcha-announces-invisible-background-captchas/ (last accessed Nov. 14, 2021).

[13] *See* Wei Lu, *Introducing reCAPTCHA v3: the new way to stop bots*, Google Search Central Blog (Oct. 29, 2018), available at https://developers.google.com/search/blog/2018/10/introducing-recaptcha-v3-new-way-to (last accessed Nov. 30, 2021).

suspicious traffic while letting your human users enjoy a frictionless experience on your site."[14]

44.     At all times since the Asserted Patents issued, and through the present and continuing forward, Google has continuously implemented, used, distributed, offered for sale, and sold CAPTCHA security methods that infringe the Asserted Patents—including, without limitation, Google reCAPTCHA v2 Checkbox, Google reCAPTCHA v2 Invisible, Google reCAPTCHA v3, and Google reCAPTCHA Enterprise. Google has acted and continues to act unlawfully, without Nobots's consent or authorization, and without paying Nobots a reasonable royalty for Google's substantial use of Nobots's novel and valuable inventions.

## COUNT ONE
### INFRINGEMENT OF U.S. PATENT NO. 9,595,008

45.     Nobots repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

46.     Google has infringed and continues to infringe at least claim 1 of the '008 Patent in violation of 35 U.S.C. § 271, either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States, and/or importing into the United States, without authorization, utilities that practice at least Claim 1 of the '008 Patent. Google is liable for its infringement of the '008 Patent pursuant to 35 U.S.C. § 271(a), (b), and (c).

47.     More specifically, Google designs, implements, imports, offers for sale, and/or sells CAPTCHA security methods that assess a confidence level that an operator of a client computing device interacting with a server is a human being rather than an autonomic computer application, or bot, based on a comparison of monitored user data and generates a value representing a confidence level that a human, and not a bot, is operating the client computing device.

48.     Claim 1 is illustrative of the '008 Patent. It recites "[a] method for assessing a

---

[14] *Id.*

confidence level that an operator of a client computing device interacting with a server is a human being rather than an autonomic computer application, the method comprising:

a)   a single user of a client computing devices requesting data from a server;

b)   the server presenting data issued by the server to the client computing device;

c)   monitoring at least some data generated by the user at the client computing device in response to the issued data;

d)   comparing the monitored data to model data relating to human interaction with or in response to the issued data;

e)   generating a value that represents a confidence level that the monitored data is a result of human interaction on the client computing device rather than that of an autonomic user with or in response to the issued data."

49.   Each of the accused reCAPTCHA methods meet every element of this claim.[15] As described above, each of the three improved reCAPTCHA methods implemented by Google is a method for assessing a confidence level that a user of a client computing device interacting with a server is a human being rather than an autonomic computer application. Google itself explains that reCAPTCHA "protects your site from spam and abuse. It uses advanced risk analysis techniques to tell humans and bots apart."[16]

50.   Each of the accused reCAPTCHA methods requires that one or more single users of a client computing device request data from a server. For example, reCAPTCHA involves a user submitting a form to a web site. To do this, the user's browser must make a request to the web

---

[15] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Google's products infringe the '008 Patent.

[16] *See What is reCAPTCHA?*, reCAPTCHA, https://developers.google.com/recaptcha (last visited Nov. 5, 2021).

site's server. The server then responds with HTML provided by Google that includes a script tag

instructing the browser to make a request to google.com to download the reCAPTCHA JavaScript.

This is illustrated in Figure 4 below.

**Figure 4**



51.     Figure 5 below shows sample code on Google's reCAPTCHA website depicting

this script:

**Figure 5**

```html
<html>
  <head>
    <title>reCAPTCHA demo: Simple page</title>
    <script src="https://www.google.com/recaptcha/api.js" async defer></script>
  </head>
  <body>
    <form action="?" method="POST">
      <div class="g-recaptcha" data-sitekey="your_site_key"></div>
      <br/>
      <input type="submit" value="Submit">
    </form>
  </body>
</html>
```

**Source:** *reCAPTCHA v.2*, reCAPTCHA, https://developers.google.com/recaptcha/docs/display

(last visited Nov. 5, 2021).

52.     Each of the accused reCAPTCHA methods also requires that the server respond by

presenting data issued by the server to the client computing device. For example, when the sample

code in Figure 5 from Google's reCAPTCHA website is executed, one or more Google servers

responds by sending the browser JavaScript code to the client computing device. In particular, and as depicted in Figure 6 below, the server responds with a JavaScript file called api.js.

**Figure 6**



53.     Subsequently, one or more Google servers present additional data, including a JavaScript file such as "recaptcha_en.js."[17] This is depicted in Figure 7, below.

**Figure 7**



54.     Each of the accused reCAPTCHA methods requires monitoring at least some data generated by the user at the client computing device in response to the issued data. For example, the JavaScript code Google transmits to the user adds what are known as "event listeners," code that is executed upon the occurrence of certain actions, such as the activation of an on-screen button, the movement of a mouse pointer, the scrolling of a web page, the placement of a cursor

---

[17] The "en" in the file name defines the language that will be used when the widget is rendered and can change; for instance, were French to be used, then the "en" would be "fr" instead.

in or out of a form field, and the like.[18] Such "event listeners" allow Google to monitor and track keyboard, mouse, touch, scroll and, resize events and movements. Figure 8 below depicts the creation of event listeners upon the execution of "reCAPTCHA_en.js."

**Figure 8**



55.     The operation of event listeners is further demonstrated by Figures 9 and 10 below, which show how the use of reCAPTCHA v2 Checkbox allows for mouse movements to be tracked.

---

[18]     *See, e.g., JavaScript: Events and Listeners*, I'd Rather be Writing, https://idratherbewriting.com/events-and-listeners-javascript/ (last visited Nov. 5, 2021).

**Figure 9**



**Figure 10**



56.     Google has also made various statements indicating that it engages in monitoring with "event listeners." For instance, Vinay Shet, the former Google Product Manager of reCAPTCHA, told Wired.com that "the tiny mouse movement a user's mouse makes as it hovers and approaches a checkbox can help reveal an automated bot."[19]

57.     Each of the accused reCAPTCHA methods compares the monitored data to model data relating to human interaction with the issued data or in response to the issued data. For example, as depicted in Figure 11 below, a payload generated by the JavaScript event listeners is

---

[19] *See* Andy Greenberg, *Google Can Now Tell You're Not a Robot with Just One Click*, Wired (Dec. 3, 2014), https://wired.com/2014/12/google-one-click-recaptcha.

transmitted to Google, which applies the data in the payload to the reCAPTCHA algorithm that compares such data to model data relating to human interactions in order to determine whether the user is to be treated as a human or bot.

**Figure 11**



58.     Figure 12 below shows that in the context of the reCAPTCHA v2 Checkbox version, the "recaptcha_en.js" code is utilized when the event handler calls Google's function.

**Figure 12**



59.     For example, when the user clicks on the checkbox, a POST request with an obfuscated payload that contains the event listener data depicted above in Figures 9 and 10 is transmitted to Google, which uses this data to determine whether it believes the user is a human. This process is depicted in Figure 13 below.

**Figure 13**



60.     Further, the data is used by Google's risk-analysis engine to evaluate whether the user is a human or potentially a bot by comparing the monitored data to model data. If it is potentially a bot, Google may issue additional challenges, as depicted in Figure 14 below.

**Figure 14**

However, CAPTCHAs aren't going away just yet. In cases when the risk analysis engine can't confidently predict whether a user is a human or an abusive agent, it will prompt a CAPTCHA to elicit more cues, increasing the number of security checkpoints to confirm the user is valid.



**Source:** Vinay Shet, *Are You a Robot? Introducing "No CAPTCHA reCAPTCHA,"* Google Security Blog (Dec. 3, 2014), https://security.googleblog.com/2014/12/are-you-robot-introducing-no-captcha.html.

61.     Google's comparison of monitored to model data is further demonstrated by Google's websites, screenshots of which are contained in Figures 15 and 16 below, and which reflect that Google uses prior interactions with a website as part of its analysis:

**Figure 15**

Placement on your website

reCAPTCHA v3 will never interrupt your users, so you can run it whenever you like without affecting conversion. reCAPTCHA works best when it has the most context about interactions with your site, which comes from seeing both legitimate and abusive behavior. For this reason, we recommend including reCAPTCHA verification on forms or actions as well as in the background of pages for analytics.

**Source**: *reCAPTCHA v.3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

**Figure 16**

The updated system uses advanced risk analysis techniques, actively considering the user's entire engagement with the CAPTCHA—before, during and after they interact with it. That means that today the distorted letters serve less as a test of humanity and more as a medium of engagement to elicit a broad range of cues that characterize humans and bots.

As part of this, we've recently released an update that creates different classes of CAPTCHAs for different kinds of users. This multi-faceted approach allows us to determine whether a potential user is actually a human or not, and serve our legitimate users CAPTCHAs that most of them will find easy to solve. Bots, on the other hand, will see CAPTCHAs that considerably more difficult and designed to stop them from getting through.

**Source**: Vinay Shet, *reCAPTCHA Just Got Easier (But only if You're Human)*, Google Security Blog (Oct. 25, 2013), https://security.googleblog.com/2013/10/recaptcha-just-got-easier-but-only-if.html.

62.     Each of the accused reCAPTCHA methods generates a value representing a confidence level that the monitored data is the result of human interaction on the client computing device, rather than that of an autonomic user, with the issued data or in response to the issued data. For example, in the reCAPTCHA v2 methods, one or more Google servers input the monitored data into the reCAPTCHA algorithm (which Google terms its "risk analysis engine"). The algorithm then outputs a value between 0.0 and 1.0, with 0.0 indicating that Google believes the user is a bot and 1.0 indicating that Google believes the user is a human. Additional challenges may be issued if Google is not confident. Sample results are depicted in Figure 17 below.

**Figure 17**

reCAPTCHA v2 ⊝



**Source**: *Analytics*, reCAPTCHA, https://developers.google.com/recaptcha/docs/analytics (last visited Dec. 6, 2021).

     63.    In the reCAPTCHA v3 version, a value between 0.0 and 1.0 also is returned, with a 0.0 signifying that Google is confident that the user is a bot and a 1.0 signifying that Google is confident that the user is a human, as explained in Figure 18 below. In the event that Google is not confident, additional challenges – such as two-factor authentication or email verification – may be issued. Sample results are depicted in Figure 19 below.

**Figure 18**

Interpreting the score

reCAPTCHA v3 returns a score (1.0 is very likely a good interaction, 0.0 is very likely a bot). Based on the score, you can take variable action in the context of your site. Every site is different, but below are some examples of how sites use the score. As in the examples below, take action behind the scenes instead of blocking traffic to better protect your site.

| Use case | Recommendation |
|---|---|
| homepage | See a cohesive view of your traffic on the admin console while filtering scrapers. |
| login | With low scores, require 2-factor-authentication or email verification to prevent credential stuffing attacks. |
| social | Limit unanswered friend requests from abusive users and send risky comments to moderation. |
| e-commerce | Put your real sales ahead of bots and identify risky transactions. |

reCAPTCHA learns by seeing real traffic on your site. For this reason, scores in a staging environment or soon after implementing may differ from production. As reCAPTCHA v3 doesn't ever interrupt the user flow, you can first run reCAPTCHA without taking action and then decide on thresholds by looking at your traffic in the admin console. By default, you can use a threshold of 0.5.

**Source**: *reCAPTCHA v.3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

**Figure 19**

reCAPTCHA v3



**Source**: *Analytics*, reCAPTCHA, https://developers.google.com/recaptcha/docs/analytics (last visited Dec. 6, 2021).

64. Google makes, distributes, uses, imports, offers for sale, and/or sells utilities and products, such as reCAPTCHA v2 Checkbox, reCAPTCHA v2 Invisible, reCAPTCHA v3, and reCAPTCHA Enterprise, that infringe at least Claim 1 of the '008 Patent.

65. Google has sold, and continues to sell and offer for sale, these utilities in the United States, through Google websites (https://cloud.google.com/recaptcha-enterprise), including to companies throughout the State of Texas and this District.[20]

---

[20] *See*, *e.g.*, *Honor Code Reporting Form*, Baylor Univ., https://cm.maxient.com/reportingform.php?BaylorUniv&layout_id=5 (last visited Nov. 5, 2021) (reflecting that the page is protected by reCAPTCHA v2 Invisible, one of the infringing methods of reCAPTCHA).

66.     Google committed and is committing the foregoing infringing activities without license from Nobots. Google's acts of infringement have damaged Nobots, as owner and assignee of the '008 Patent. Nobots is entitled to recover from Google the damages it has sustained as a result of Google's wrongful acts in an amount subject to proof at trial. Google's infringement of Nobots's rights under the '008 Patent is ongoing and will continue to damage Nobots.

67.     Beginning no later than the filing of this Complaint, Google has had actual knowledge of the '008 Patent. Google's continued infringement following the filing of this Complaint, despite its knowledge of the '008 Patent and Nobots's infringement allegations, is intentional and deliberate and willful.

68.     In addition, Google indirectly infringed, and continues to indirectly infringe, the '008 Patent by actively inducing its infringement in violation 35 U.S.C. § 271(b).

69.     Entities, consumers, and businesses who use Google's reCAPTCHA services directly infringe the '008 Patent by using the accused Google reCAPTCHA methods.

70.     Google knowingly induced and induces these acts of infringement with the specific intent to encourage them by taking active steps to encourage and facilitate direct infringement by these third parties, in this District and elsewhere in the United States, through its design, construction, and sale of the infringing products, and through its creation and dissemination of promotional and marketing materials, supporting materials, instructions, and/or technical information relating to the reCAPTCHA methods with knowledge and the specific intent that its efforts will result in the direct infringement of the '008 Patent by these third parties.

71.     Such active steps include, for example, advertising and marketing the infringing utilities to entities, consumers, and businesses[21] and selling such utilities to consumers knowing

---

[21] See, e.g., Google Cloud, Top 10 Use Cases for reCAPTCHA Enterprise to Defend

that they would be used in the United States.

72.     Google user guides for the accused reCAPTCHA methods likewise facilitate infringement, instructing consumers about, among other things, how to "start using reCAPTCHA."[22] By instructing third parties how  use the accused utilities for infringing purposes, such as to limit website access using the infringing methods, Google knowingly induces these third parties to commit infringing acts.

**Figure 20**



**Source**: *reCAPTCHA v.3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

73.     In addition, Google has indirectly infringed and continues to indirectly infringe the '008 Patent as a contributory infringer in violation of 35 U.S.C. § 271(c) by selling or offering to

---

Against       OWASP       Web-Automated       Attacks,       *available*       at https://services.google.com/fh/files/misc/owasp_handbook_again.pdf; *reCAPTCHA Enterprise*, Google Cloud, https://cloud.google.com/recaptcha-enterprise (last visited Nov. 7, 2021); *What Is reCAPTCHA?*, reCAPTCHA, https://developers.google.com/recaptcha (last visited Nov. 7, 2021).
    [22] *Developer's Guide*, reCAPTCHA, https://developers.google.com/recaptcha/intro (last visited Nov. 7, 2021).

sell in the United States, or importing into the United States, infringing methods with knowledge that they are especially designed or adapted to operate in a manner that infringes the '008 Patent and despite the fact that the infringing technology is not a staple article of commerce suitable for substantial non-infringing use. Google knowingly incorporates methodology for assessing a confidence level that an operator of a client computing device interacting with a server is a human being rather than a bot into the accused Google reCAPTCHA methods such that they operate in an infringing manner. By incorporating such methodology into its reCAPTCHA methods, Google contributes to infringing use as consumers grant or deny access to their servers using the confidence levels generated by the accused utilities, which lack substantially noninfringing uses because the accused reCAPTCHA methods are designed and constructed to operate in a manner that infringes the '008 Patent.

74.     Google's acts of infringement have caused damage to Nobots, and Nobots is entitled to recover from Google (or any successor entity to Google) the damages sustained by Nobots as a result of Google's wrongful acts in an amount subject to proof at trial.

<div align="center">

**COUNT TWO**
**INFRINGEMENT OF U.S. PATENT NO. 10,423,885**

</div>

75.     Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

76.     Google has infringed and continues to infringe at least Claim 1 of the '885 Patent in violation of 35 U.S.C. § 271, either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States, and/or importing into the United States, without authorization, utilities that practice at least Claim 1 of the '885 Patent. Google is liable for its infringement of the '885 Patent pursuant to 35 U.S.C. § 271(a), (b), and (c).

77.     More specifically, Google designs, constructs, imports, offers for sale, and/or sells

CAPTCHA security methods that test for a presence of biometric data with an operator of a client computing device attempting to access a server and controls access to the server by denying access when the biometric data is not present and/or not denying access when some biometric data is present.

78.     Claim 1 is illustrative of the '885 Patent. It recites "[a] method comprising:

a)     testing for a presence of biometric data associated with an operator of a computing device attempting to access a server;

b)     controlling access to the server by at least one of:

i.     denying access of the computing device attempting to access the server when the biometric data is not present; or

ii.    not denying access of the computing device attempting to access the server when some biometric data is present."

79.     Each of the accused reCAPTCHA methods meets every element of this claim.[23] Each of the accused reCAPTCHA methods requires testing for a presence of biometric data associated with an operator of a computing device attempting to access the server. For example, and discussed previously and depicted in Figures 8-10 above, the "reCAPTCHA_en.js" JavaScript code sent from the Google servers to the user adds "event listeners" to monitor and track keyboard, mouse, touch, scroll, and resize events. This tests for a presence of biometric data associated with an operator of a computing device attempting to access the server and provides Google with biometric data.

80.     Each of the accused reCAPTCHA methods controls access to the server by denying access of the computing device attempting to access the server when the biometric data is not

---

[23] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Google's products infringe the '885 Patent.

present. For example, the above-identified biometric data comprise some of the data used by Google's reCAPTCHA algorithm. As discussed previously and depicted in Figures 11, 13, and 15-19 above, for all of the reCAPTCHA v2 and v3 versions, Google's servers input the collected biometric data into its reCAPTCHA algorithm (which Google refers to as its "risk analysis engine"), and the algorithm then outputs a value between 0.0 and 1.0, with 0.0 indicating that Google believes the user is a bot and 1.0 indicating that Google believes the user is a human. Additional challenges may be issued if Google is not confident. The lack of the desired biometric data results in a low score, which can lead to a denial of access.

81.     The accused reCAPTCHA methods also control access to the server by not denying access of the computing device attempting to access the server when some biometric data is present. That is, the presence of the desired biometric data results in a high score from the algorithm and allows access.

82.     Google makes, distributes, uses, imports, offers for sale, and/or sells utilities and products, such as reCAPTCHA v2 Checkbox, reCAPTCHA v2 Invisible, reCAPTCHA v3, and reCAPTCHA Enterprise, that infringe at least Claim 1 of the '885 Patent.

83.     Google has sold, and continues to sell and offer for sale, these utilities in the United States, including through Google websites (https://cloud.google.com/recaptcha-enterprise), to companies throughout the State of Texas and in this District.[24]

84.     Google committed and is committing the foregoing infringing activities without license from Nobots. Google's acts of infringement have damaged Nobots, as owner and assignee of the '885 Patent. Nobots is entitled to recover from Google the damages it has sustained as a

---

[24]     *See*,     *e.g.*,     *Honor     Code     Reporting     Form*,     Baylor     Univ., https://cm.maxient.com/reportingform.php?BaylorUniv&layout_id=5 (last visited Nov. 5, 2021) (reflecting that the page is protected by reCAPTCHA v2 Invisible, one of the infringing methods of reCAPTCHA).

result of Google's wrongful acts in an amount subject to proof at trial. Google's infringement of Nobots's rights under the '885 Patent is ongoing and will continue to damage Nobots.

85.     Beginning no later than the filing of this Complaint, Google has had actual knowledge of the '885 Patent. Google's continued infringement following the filing of this Complaint, despite its knowledge of the '885 Patent and Nobots's infringement allegations, is intentional and deliberate and willful.

86.     In addition, Google indirectly infringed, and continues to indirectly infringe, the '885 Patent by actively inducing its infringement in violation 35 U.S.C. § 271(b).

87.     Entities, consumers, and businesses who use Google's reCAPTCHA services directly infringe the '885 Patent by using the accused Google reCAPTCHA methods.

88.     Google knowingly induced and induces these acts of infringement with the specific intent to encourage them by taking active steps to encourage and facilitate direct infringement by these third parties, in this District and elsewhere in the United States, through its design, construction, and sale of the infringing products, and through its creation and dissemination of promotional and marketing materials, supporting materials, instructions, and/or technical information relating to the reCAPTCHA methods with knowledge and the specific intent that its efforts will result in the direct infringement of the '885 Patent by these third parties.

89.     Such active steps include, for example, advertising and marketing the infringing utilities to entities, consumers, and businesses[25] and selling such utilities to consumers knowing and intending that they would be used in the United States.

---

[25] *See*, *e.g.*, Google Cloud, Top 10 Use Cases for reCAPTCHA Enterprise to Defend Against OWASP Web-Automated Attacks, *available* at https://services.google.com/fh/files/misc/owasp_handbook_again.pdf; *reCAPTCHA Enterprise*, Google Cloud, https://cloud.google.com/recaptcha-enterprise (last visited Nov. 7, 2021); *What Is reCAPTCHA?*, reCAPTCHA, https://developers.google.com/recaptcha (last visited Nov. 7, 2021).

90.     Google user guides for the accused reCAPTCHA methods likewise facilitate infringement, instructing consumers about, among other things, how to "start using reCAPTCHA."[26] By instructing third parties how use the accused utilities for infringing purposes, such as to limit website access using the infringing methods, Google knowingly induces these third parties to commit infringing acts:

**Figure 21**



Source: *reCAPTCHA v.3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

91.     In addition, Google has indirectly infringed and continues to indirectly infringe the '885 Patent as a contributory infringer in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, infringing methods with knowledge that they are especially designed or adapted to operate in a manner that infringes the '885 Patent and despite the fact that the infringing technology is not a staple article of commerce suitable for

---

[26] *Developer's Guide*, reCAPTCHA, https://developers.google.com/recaptcha/intro (last visited Nov. 7, 2021).

substantial non-infringing use. Google knowingly incorporates methodology for assessing a confidence level that an operator of a client computing device interacting with a server is a human being rather than a bot based on biometric data into the accused Google reCAPTCHA methods such that they operate in an infringing manner. By incorporating such methodology into its reCAPTCHA methods, Google contributes to infringing use as consumers grant or deny access to their servers using the confidence levels generated by the accused utilities, which lack substantially non-infringing uses because the accused reCAPTCHA methods are designed and constructed to operate in a manner that infringes the '885 Patent.

92.      Google's acts of infringement have caused damage to Nobots, and Nobots is entitled to recover from Google (or any successor entity to Google) the damages sustained by Nobots as a result of Google's wrongful acts in an amount subject to proof at trial.

### DEMAND FOR JURY TRIAL

93.      Plaintiff Nobots hereby demands a jury trial for all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nobots LLC requests entry of judgment in its favor and against Defendant Google as follows:

A.      Declaring that Google has infringed United States Patent No. 9,595,008;

B.      Declaring that Google has infringed United States Patent No. 10,423,885;

C.      Declaring that Google's infringement of United States Patent No. 9,595,008 has been willful and deliberate, at least from the filing of this Complaint;

D.      Declaring that Google's infringement of United States Patent No. 10,423,885 has been willful and deliberate, at least from the filing of this Complaint;

E.      Awarding damages to Plaintiff in an amount no less than a reasonable royalty for

Google's infringement of United States Patent No. 9,595,008 and United States Patent No. 10,423,885, together with treble damages for willful infringement, prejudgment and post-judgment interest, and costs, as permitted under 35 U.S.C. § 284;

F.      Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

G.      Ordering Google to pay supplemental damages to Nobots, including any ongoing royalties and interest, with an accounting, as needed; and

H.      Awarding such other costs and further relief as the Court may deem just and proper.

Dated:  December 10, 2021                          Respectfully submitted,

                                                   /s/ *Charles L. Ainsworth*

                                                   Charles L. Ainsworth (Texas 00783521)
                                                   Robert Christopher Bunt (Texas 00787165)
                                                   PARKER, BUNT & AINSWORTH, P.C.
                                                   100 East Ferguson, Suite 418
                                                   Tyler, Texas 75702
                                                   Tel: (903) 531-3535
                                                   Email: charley@pbatyler.com
                                                   Email: rcbunt@pbatyler.com

                                                   Matthew R. Berry
                                                   Andres Healy
                                                   John E. Schiltz
                                                   SUSMAN GODFREY L.L.P.
                                                   1201 Third Avenue, Suite 3800
                                                   Seattle, WA 98101-3000
                                                   Tel: (206) 516-3880
                                                   Fax: (206) 516-3883
                                                   Email: mberry@susmangodfrey.com
                                                   Email: ahealy@susmangodfrey.com
                                                   Email: jschiltz@susmangodfrey.com

                                                   Komal S. Patel
                                                   SUSMAN GODFREY L.L.P.
                                                   1301 Avenue of the Americas, 32nd Floor

New York, NY 10019
Phone: (212) 336-8330
Fax: (212) 336-8340
Email: kpatel@susmangodfrey.com

*Attorneys for Nobots LLC*